**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**TROY PROFFITT et al.,**

                **Plaintiffs,**     **3:15-cv-750 (GLS/DEP)**

      v.

**VILLAGE OF DEPOSIT et al.,**

                **Defendants.**
_____

**APPEARANCES:**      **OF COUNSEL:**

**FOR THE PLAINTIFFS:**
Office of Ronald R. Benjamin      RONALD R. BENJAMIN, ESQ.
P.O. Box 607
126 Riverside Drive
Binghamton, NY 13902-0692

**FOR THE DEFENDANTS:**
Office of Frank W. Miller      FRANK W. MILLER, ESQ.
6575 Kirkville Road
East Syracuse, NY 13057

**Gary L. Sharpe**
**Senior District Judge**

# MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiffs Troy Proffitt, Dawn Proffitt, and Corey Proffitt bring this action pursuant to 42 U.S.C. § 1983, alleging that "defendants' conduct contravened plaintiffs' rights a[s] guaranteed by the Constitution of [the]

United States, including but not limited to the First, Fourth, Fifth[,] and Fourteenth Amendments." (Compl., Dkt. No. 2 ¶ 29.)  Plaintiffs demand compensatory damages, exemplary damages, costs, and "a permanent injunction enjoining the defendants from coming within 500 feet of [them]." (*Id*. at 8.)

Pending before the court is defendants' motion for summary judgment, (Dkt. No. 30), which is granted in part and denied in part for the following reasons.

## II.  Background

### A.  Facts[1]

Troy and Dawn Proffitt, husband and wife, along with their son, Corey, bring this action against the Village of Deposit, the Deposit police chief, Donald Cantwell, and Deposit police officers, Joshua Williamson, Aaron Smith, Roger Singleton, and Jonathan O'Connor.  (Compl. ¶¶ 1-8.) They contend that "defendants have repeatedly stopped [them] while driving on public roads, for no reason at all other than to intimidate and harass them."  (*Id.* ¶ 10.)  Specifically, this action revolves around thirty-

---

[1] Unless otherwise noted, the facts are undisputed.

three[2] traffic stops that occurred between July 23, 2011 and October 22, 2015. (Defs.' Statement of Material Facts (SMF) ¶ 16, Dkt. No. 30, Attach. 1.)

Occasion[3] 1 involved the New York State Police and occurred on July 23, 2011, more than three years before the filing of plaintiffs' complaint on May 18, 2015. (*Id.* ¶¶ 18, 19.) Although the specifics of this occasion are not discussed, the parties dispute whether it falls outside the statute of limitations. (*Id.* ¶ 18; Pls.' Statement of Material Facts (SMF) ¶ 18, Dkt. No. 34.) Likewise, the specifics of other occasions are not discussed because they involved non-party police agencies of which defendants have no authority over. (Defs.' SMF ¶¶ 19-22, 29-31.) For instance, occasions 2-4, 8, 14, 17, and 26 primarily involved the State Police, (*id.* ¶ 19), occasion 11 primarily involved the Delaware County Sheriff's Department, (*id.* ¶¶ 82-85, 90-91), and occasions 7, 15-16, 20-21, 27-28, and 33 all primarily involved the Village of Hancock Police Department, (*id.* ¶ 28).

---

[2] Although plaintiffs do not contest that they were stopped thirty-three times, they inexplicably cite "34" occasions in their response in opposition to defendants' motion for summary judgment. (Dkt. No. 34, Attach. 5 at 1.) As there is no basis in the record to provide for this additional stop, the court considers the statement a typographical error.

[3] Both parties refer to the various interactions between them as "occasions." (Defs.' SMF ¶ 17.) The court adopts the same term in an effort to maintain consistency.

However, during these occasions, O'Connor also worked part-time for the Village of Hancock Police Department under the exclusive authority of Hancock's police chief.  (*Id.* ¶¶ 33-34, 37.)  Plaintiffs contend that O'Connor was primarily involved in the Hancock stops on occasions 7, 15, 21, and 28.  (Pls.' SMF ¶¶ 286, 298-99, 309, 320.)

Several of the remaining occasions were not traffic stops.  For instance, occasion 5 consisted of Corey receiving a parking ticket for parking illegally in the Village of Deposit employee parking lot; he was not present when the ticket was issued, and he later paid the applicable fine.  (Defs.' SMF ¶¶ 40-41, 43.)  Occasion 6 occurred in the early afternoon when Cantwell pulled his police car parallel to Corey's car in a store parking lot and advised him not to speed, after learning from a crossing guard that Corey had been speeding by the high school earlier.  (*Id.* ¶¶ 44-54.)  Occasion 31 involved Troy and a non-party Deposit officer engaging in a casual conversation in a public parking lot wherein no directives were given and Troy's ability to leave was not impeded.  (*Id.* ¶¶ 240-61.)

The remaining occasions involved traffic stops based on defendants' direct observations or other sources of reasonable suspicion for various vehicle and traffic violations.  For instance, occasion 9 consisted of a non-

4

party Deposit officer, who was with Williamson, stopping Corey's car after they observed him driving with an expired inspection sticker and later learned that he did not have a valid license.  (*Id.* ¶¶ 55-70.)  Similarly, occasion 10 consisted of Singleton and Williamson pulling over Corey shortly thereafter upon their suspicion that he still did not have a valid license, at which point he produced a valid license and was sent on his way without a citation.  (*Id.* ¶¶ 71-81.)

About a week later, occasion 12 occurred, which consisted of O'Connor observing Corey traveling at a high rate of speed, as confirmed by the use of a radar gun, and pulling him over to issue a traffic infraction ticket.  (*Id.* ¶¶ 96-106.)  Over two weeks later, occasion 13 occurred, which consisted of Singleton and O'Connor initiating a traffic stop of Troy's car after observing Corey and Troy following their patrol cars around for hours while making obscene gestures and exhibiting other threatening behavior late at night.  (*Id.* ¶¶ 111-38.)  After a brief conversation, defendants did not issue Troy a citation.  (*Id.* ¶¶ 139-43.)

A few months later, occasion 18 occurred, which consisted of a non-party Deposit officer issuing Corey a ticket for driving with an illegal window tint after observing a vehicle with "opaque" windows.  (*Id.* ¶¶ 144-59.)  A

month or so later, occasion 19 occurred, which involved Williamson pulling over Dawn after noticing that she was operating a vehicle without a clearly visible license plate. (*Id.* ¶¶ 169-73.) Upon pulling her over and examining the vehicle more closely, Williamson realized the rear license plate lamp only appeared inoperable because it was covered in dirt, so he allowed her to proceed without issuing a traffic citation. (*Id.* ¶¶ 173-77.)

Occasion 22 occurred months later when Williamson and Singleton received a report that a car was being driven with an invalid license plate. (*Id.* ¶¶ 178-83.) After pulling the car over, which Corey was driving, the officers verified that the car's license plate did not match its registration, but decided not to issue a ticket because the violation was an honest mistake. (*Id.* ¶¶ 184-90.) Less than a month later, occasion 23 occurred, which involved Williamson pulling over Corey after observing a passenger riding in the bed of his pickup truck. (*Id.* ¶¶ 191-94.) Williamson issued Corey a verbal warning about the hazards of such conduct and allowed him to proceed on his way. (*Id.* ¶¶ 195-96.) About two months after this occasion, Williamson and Singleton stopped Corey for driving with an impermissibly loud exhaust system and issued him a verbal warning, which constituted occasion 24. (*Id.* ¶¶ 197-203.)

month or so later, occasion 19 occurred, which involved Williamson pulling over Dawn after noticing that she was operating a vehicle without a clearly visible license plate. (*Id.* ¶¶ 169-73.) Upon pulling her over and examining the vehicle more closely, Williamson realized the rear license plate lamp only appeared inoperable because it was covered in dirt, so he allowed her to proceed without issuing a traffic citation. (*Id.* ¶¶ 173-77.)

Occasion 22 occurred months later when Williamson and Singleton received a report that a car was being driven with an invalid license plate. (*Id.* ¶¶ 178-83.) After pulling the car over, which Corey was driving, the officers verified that the car's license plate did not match its registration, but decided not to issue a ticket because the violation was an honest mistake. (*Id.* ¶¶ 184-90.) Less than a month later, occasion 23 occurred, which involved Williamson pulling over Corey after observing a passenger riding in the bed of his pickup truck. (*Id.* ¶¶ 191-94.) Williamson issued Corey a verbal warning about the hazards of such conduct and allowed him to proceed on his way. (*Id.* ¶¶ 195-96.) About two months after this occasion, Williamson and Singleton stopped Corey for driving with an impermissibly loud exhaust system and issued him a verbal warning, which constituted occasion 24. (*Id.* ¶¶ 197-203.)

Days later, occasion 25 occurred, which consisted of Smith and Williamson observing Troy traveling at a high rate of speed, as confirmed by the use of a radar gun, and pulling him over to issue a ticket. (*Id.* ¶¶ 204-10.) About four months later, occasion 29 occurred, which similarly consisted of Smith observing Corey traveling at a high rate of speed, as confirmed by the use of a radar gun, and pulling him over to issue a ticket. (*Id.* ¶¶ 212-17.) After stopping Corey's car, Smith discovered that his vehicle inspection was expired, so he issued Corey a ticket for that as well. (*Id.* ¶¶ 218-19.) Minutes after Corey was issued these two tickets, occasion 30 occurred when he pulled alongside Smith, rolled down his window, uttered a vulgarity, disobeyed Smith's directions, and spun his tires as he left the scene. (*Id.* ¶¶ 221-28.) Upon pursuing and eventually pulling over Corey again, Smith decided not to issue any new tickets. (*Id.* ¶¶ 229-39.)

Nearly one month later, occasion 32 occurred, which involved Smith and Williamson pulling over Dawn and issuing her a ticket after they allegedly observed her driving while using her cell phone. (*Id.* ¶¶ 265-71.) Although plaintiffs contend that "Dawn was not holding her phone," (Pls.' SMF ¶¶ 269-70), they admit that the Village of Deposit Justice Court

7

convicted her of the charge following a bench trial, (Defs.' SMF ¶ 272).

## B.   Procedural History

Defendants removed this action to federal court after plaintiffs originally filed their complaint in New York State Supreme Court in Broome County.  (Dkt. No. 1.)  At the close of discovery, defendants moved for summary judgment on plaintiffs' claims.  (Dkt. No. 30.)

## III.  Standard of Review

The standard of review pursuant to Rule 56 of the Federal Rules of Civil Procedure is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV.  Discussion[4]

---

[4] First, it should be noted that plaintiffs' complaint fails to enumerate specific causes of action or to trace factual allegations to specific legal theories.  (Compl.)  When plaintiffs are represented by legal counsel, neither the court nor defendants should have to engage in guesswork to address every possible legal theory of a constitutional violation that is not clearly delineated in their complaint.  As such, an inference that plaintiffs have abandoned several of their claims is "fairly drawn from the papers and circumstances viewed as a whole."  *Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014).  Specifically, plaintiffs have constructively abandoned their First Amendment claim by failing to point to any government abridgment of their protected speech rights and raising no arguments as to why defendants' motion to dismiss should not be granted in this regard.  (Compl. ¶ 29; Dkt. No. 34, Attach. 5.)  Additionally, their Fifth Amendment claim's abandonment is inferred from the dearth of federal action alleged.  *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002).  Moreover, other claims are discussed in the parties' briefs that are not included in plaintiffs' complaint whatsoever.  As such, if they ever existed, these claims are dismissed.

8

### A.  Statute of Limitations

In New York, § 1983 claims must be brought within three years. *See Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). Occasion 1 involved the State Police and occurred on July 23, 2011—more than three years before the filing of plaintiffs' complaint on May 18, 2015. (Defs.' SMF ¶¶ 18, 19.) As such, even if defendants were personally involved on this occasion, it is dismissed.[5]

### B.  Lack of Personal Involvement

It is well settled that a plaintiff seeking monetary damages under § 1983 must demonstrate defendants' personal involvement in the alleged constitutional deprivation. *See Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001). Plaintiffs initially admitted to defendants' lack of personal involvement in numerous stops. (Defs.' SMF ¶¶ 19-22, 28-31.) Now, without citing any evidence in the record, plaintiffs try to rebut these admissions by claiming that defendants provided backup support for traffic stops that they did not initiate. (Dkt. No. 34, Attach. 5 at 2-4.) This is insufficient. Plaintiffs fail to raise a genuine issue of material fact regarding

---

[5] Plaintiffs argue that defendants' conduct occurring outside the statute of limitations period is not time barred based on a "continuing course of treatment" theory. (Dkt. No. 34, Attach. 5 at 15-16.) However, a similar theory presented to the court in *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980) was rejected.

defendants' lack of personal liability for the actions of other independent police entities that exclusively initiated the traffic stops on occasions 1-4, 8, 11, 14, 16-17, 20, 26-27, and 33. Accordingly, for the reasons stated by defendants, (Dkt. No. 30, Attach. 12 at 1-3; Dkt. No. 38 at 2-3), summary judgment is granted on these claims and they are dismissed. However, plaintiffs have sufficiently demonstrated O'Connor's personal involvement with respect to occasions 7, 15, 21, and 28. (Pls.' SMF ¶¶ 286, 298-99, 309, 320.) Because defendants fail to address the specifics of these occasions, the claims stemming from these stops survive.

**C.     Fourth Amendment**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Notably, consensual encounters between police officers and citizens do not trigger Fourth Amendment scrutiny. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."); *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) ("Obviously, not all personal intercourse between police[] [officers] and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or

show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). However, a traffic stop, even if only for a limited period and purpose, may constitute a seizure within the meaning of the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 809-10 (1996) (collecting cases); *see also Gilles v. Repicky*, 511 F.3d 239, 244-45 (2d Cir. 2007). As such, a traffic stop must at least be based on a reasonable suspicion of a traffic violation in order to comport with the Fourth Amendment. *See United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009). All that reasonable suspicion requires is "some minimal level of objective justification." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks and citation omitted). Additionally, a subsequent conviction precludes false arrest claims. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

  1.  *Casual Encounters*

Occasions 6 and 31 involved casual encounters between plaintiffs and defendants, which do not trigger Fourth Amendment scrutiny. *See Bostick*, 501 U.S. at 434; *Terry*, 392 U.S. at 19 n.16. Furthermore, there is no seizure involved with placing a parking ticket on an unattended car as occurred on occasion 5. *See Burg v. Gosselin*, 591 F.3d 95, 101 (2d Cir.

11

2010) (finding that "a pre-arraignment, non-felony summons requiring no more than a later court appearance does not constitute a Fourth Amendment seizure."). For these reasons, and the reasons stated by defendants, (Dkt. No. 30, Attach. 12 at 3-5), the claims stemming from these occasions are dismissed.

### 2. Traffic Stops

Plaintiffs fail to controvert the fact that the remaining traffic stops were based upon defendants' reasonable suspicions of traffic violations or other criminal activity. (Dkt. No. 30, Attach. 12 at 1-2.) For the majority of their legal arguments and factual assertions, plaintiffs fail to provide any citations whatsoever. (Dkt. No. 34, Attach. 5.) Where plaintiffs do provide citations, they cut against their argument. (*Id.* at 4, 6.)

For instance, plaintiffs rely on *City of Indianapolis v. Edmond*, 531 U.S. 32, 48 (2000), (Dkt. No. 34, Attach. 5 at 4), where the Supreme Court found that a checkpoint program with the primary purpose of detecting evidence of ordinary criminal wrongdoing violated the Fourth Amendment. Notable in that decision was the lack of any individualized suspicion on behalf of the officers conducting the checkpoint stop. *See Edmond*, 531 U.S. at 44. Moreover, the Court made clear that the decision "does not

12

impair the ability of police officers to act appropriately upon information that they properly learn during a checkpoint stop *justified by a lawful primary purpose.*" *Id*. at 48 (emphasis added). Here, for starters, there are no checkpoint stops alleged. Secondly, plaintiffs have not controverted the lawful primary purpose of the majority of traffic stops presented by defendants. *See supra* Part II. A*.* In *United States v. Martinez–Fuerte*, 428 U.S. 543, 561-63 (1976), another case plaintiffs rely upon, (Dkt. No. 34, Attach. 5 at 5), the Supreme Court upheld permanent check point stops where their purpose was legitimate and intrusion was minimal. There, the Court reasserted that "one's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence." *Id.* at 561. Plaintiffs fail to articulate how this inapposite case law supports their claims.

Without the need for further discussion, plaintiffs' claims ultimately crumble based on the previously-discussed admissions to the majority of defendants' statement of material facts, which demonstrate that the traffic stops were based on reasonable suspicions of traffic violations. *See Stewart*, 551 F.3d at 191. Plaintiffs only deny the observations giving rise

13

to the traffic stop on occasion 32. (Pls.' SMF ¶¶ 268-70.) However, their admission that Dawn was later convicted of a traffic infraction based on this occasion, (*id.* ¶ 272), conclusively demonstrates the existence of probable cause. See *Weyant*, 101 F.3d at 852.

In conclusion, plaintiffs fail to point to any credible evidence of defendants' improper motive and largely resurrect arguments that should have been made in local traffic court. As such, plaintiffs' Fourth Amendment claims stemming from occasions 9-10, 12-13, 18-19, 22-25, 29-30, and 32 are dismissed.[6] See *supra* Part II. A.

## D. Fourteenth Amendment

### 1. Due Process[7]

The Fourteenth Amendment is not the proper avenue for protection from the conduct plaintiffs complain of. See *Albright v. Oliver*, 510 U.S. 266, 269-75 (1994) ("Where a particular Amendment 'provides an explicit

---

[6] Defendants' qualified immunity analysis would have provided alternative grounds for summary judgment, (Dkt. No. 30, Attach. 12 10-20); however, "where there is no viable constitutional claim, defendants have no need of an immunity shield," *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (internal quotation marks and citation omitted).

[7] Plaintiffs fail to specify whether they are claiming a violation of their procedural or substantive due process rights. (Compl. ¶ 29.) However, it is apparent from the facts alleged and their responsive papers that they are claiming a violation of their substantive due process rights. (*Id.* ¶ 10; Dkt. No. 34, Attach. 5.) Notably, the record does not reflect that plaintiffs were denied access to the legal process available to contest any perceived deprivation of their liberty. Therefore, the court analyzes plaintiffs' claims through the lens of substantive due process.

textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'") (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  This is so because the "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).  As such, plaintiffs due process claims are more properly addressed in the Fourth Amendment context—and fail for the reasons discussed above.

   *2.  Equal Protection*

Plaintiffs also argue that defendants' selective enforcement of the vehicle and traffic laws violated their rights under the Equal Protection Clause of the Fourteenth Amendment.  (Dkt. No. 34, Attach. 5 at 11-12.)  In order to succeed on an equal protection claim based on selective enforcement, a plaintiff must prove that: "'(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Diesel v. Town of*

15

*Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)).

Although plaintiffs' assertions of selective enforcement of the vehicle and traffic law rely largely on speculation contained within their own affidavits, (Dkt. No. 34, Attach. 5 at 12, 16-18; Pls.' SMF ¶¶ 277, 288, 306, 311, 315, 329, 335), defendants fail to carry their initial burden of demonstrating their entitlement to summary judgment. *See Wagner*, 827 F. Supp. 2d at 92. Given that defendants make no effort to address why these claims should be dismissed, (Dkt. No. 30, Attach. 12; Dkt. No. 38), their motion is denied in this regard.[8]

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED IN PART and DENIED IN PART** as follows:

**DENIED** with respect to plaintiffs' § 1983 claim based on a

---

[8] Plaintiffs' corresponding claims against the Village of Deposit and remaining defendants in their official capacities also survive because defendants fail to demonstrate that they are entitled to judgment as a matter of law by disregarding whether Cantwell was a final policy maker. (Dkt. No. 30, Attach. 12 at 5-6; Dkt. No. 38 at 6-7.) As such, at this stage, there remains a triable issue of fact regarding whether Cantwell, as the chief of police involved in numerous stops, was a policy maker who encouraged or ratified a tacit policy of selective enforcement based on an improper business motive. (Pls.' SMF ¶¶ 277, 329; Dkt. No. 34, Attach. 5 at 7-9.)

>violation of the Equal Protection Clause against all defendants and plaintiffs' § 1983 claim based on a violation of the Fourth Amendment involving only occasions 7, 15, 21, and 28 against defendant Jonathan O'Connor; and
>
>**GRANTED** in all other respects; and it is further

**ORDERED** that this case is deemed trial ready and a scheduling order shall issue in due course; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

March 2, 2018
Albany, New York

_Gary L. Sharpe_
Gary L. Sharpe
U.S. District Judge

17